Frederick B. Bryant, J.
This is a proceeding to punish certain individuals for contempt of court for their refusal to obey a temporary restraining order contained in an order to show cause issued by this court on April 28, 1972. The evidentiary hearing pertaining to 18 of the named and unnamed defendants has been concluded after four days of testimony followed by extensive argument by counsel. In order to fully understand the nature of the offense charged a brief summary of the factual background is called for.
On April 26,1972, at about 2:00 p.m., a group of antiwar protestors on the Cornell campus entered the library of Carpenter *966 Hall and took control of it. Although the Cornell Safety Division was able to maintain limited control of the second floor of Carpenter Hall and one door to the main floor, from April 26 until the students left on May 1, 1972, they were in full control of all the library facilities in Carpenter Hall, which is the main library and administration building of the engineering school.
Negotiations were entered into between the students and the university administration almost immediately. (In fact, it appeared from the evidence that so-called negotiators were falling over each other with self-constituted groups of faculty and other sympathizers seeking to advise the administration from several different points of view.) The student group claimed to be representative of the Cornell community in an effort to present what it termed high moral and political issues concerning Cornell’s involvement in certain activities and financial interest in certain corporations that are allegedly militaristic. It is worthy of note that this high moral “ peace ” group chose as its name “ Giap-Cabral ” — names of the defense ministers of North Vietnam and a revolutionary leader of Guinea. The negotiations soon developed two opposing demands. The student group demanded agreement on the part of the university to accede to their demands concerning abolition of E.O.T.C. on campus, discontinuance of war-related research and other matters. The university from the beginning insisted that the students vacate the building and restore it to normal use..
When negotiations and university demands for vacation of Carpenter Hall seemed to be getting nowhere, the university applied to this court for an order calling on the students occupying Carpenter Hall to show cause why they should not be temporarily and permanently enjoined from continuing to interfere with the normal operations of the university. This order, returnable on May 1,1972, and issued on April 28,1972, contained an order temporarily restraining certain named defendants and approximately 100 unnamed defendants who were then in or about to enter Carpenter Hall—
“ 1. From congregating or assembling, within or adjacent to any of plaintiff’s academic or administrative buildings, dormitories, recreation rooms, libraries, classrooms, athletic facilities, or any other premises owned, maintained or operated by plaintiff or in any corridors, stairways, doorways and entrances thereto, or in any walkway, roadways or other places owned, maintained, or operated by plaintiff in such manner as to disrupt or interfere with normal functions conducted by plaintiff in such place or to block, hinder, impede or interfere with ingress to or *967 egress from any of such properties by plaintiff’s faculty, administrators, students, employees or guests; .
2. From employing force or violence, or threat of force or violence, against persons or property on plaintiff’s premises;
3. From threatening to do any of the above-mentioned acts ”.
This order was purportedly served on the defendants at about 6:00 p.m. on Friday, April 28,1972, in the manner directed by the court. The students refused to obey the order and contempt proceedings were started the following day by the issuance of various orders to show cause. The students finally evacuated the building on May 1,1972, during the time the motion for temporary injunction was being argued.
It should be emphasized at the start that this proceeding has not been instituted to punish the defendants for their views on the Vietnam war, on militarism or on any other subject. Of course, they undoubtedly consider themselves victims of the military establishment and martyrs to the cause of peace. Nothing the court can say will alter this opinion of themselves or the opinions of those in sympathy with their aims. The court emphasizes, however, that from the court’s point of view this is simply a proceeding to determine whether the defendants violated the order of this court, whether they were justified in doing so or whether they are guilty of contempt of the court and punishable therefor.
The defendants at the outset justify their conduct on the claim that the temporary restraining order was defective and invalid. Their first objection is that it is too broad, unclear and ambiguous. All the defendants — with one possible exception — testified (after conferring with counsel) that they did not understand it or did not think it applied to them. The court cannot accept this argument. These students were “ sitting in ” in the Carpenter Hall library and excluding those who would normally be using it. The order expressly forbids such an assembly which hinders, impedes or interferes with the normal use of such property. Had the temporary restraining order been handed to a student on the campus who was blissfully on his way to class he might well have asked himself what it was all about. But there can be no doubt that to those who were in actual occupation of Carpenter Hall; those who had been told orally and in writing that they were to vacate the hall; those whose express purpose it was to hold the library as a “ hostage ” until their demands were met — to those the order could mean only one thing, and that was to get out. It was this very act of getting out that they discussed on Friday night when considering the order and unanimously refused to do. It is the court’s holding *968 that in this context the order was clear and unambiguous and easily understood by any normal person who took the trouble to inquire about it. Further, Professor Emeritus Chandler Morse testified he knew what it meant and he was a member of the so-called negotiating committee which was the communications channel between administration and the occupying students.
Defendants further urge that the mandate was not lawfully effective as to unnamed defendants. The court does not understand the cases to so hold under the situation here. This order was directed to and delivered to those who were in occupation of Carpenter Hall — either at the time when read or in the immediate past or future. This was a definite and identifiable group. The lack of a name which could be supplied by positive identification before further action was taken and could connect an individual with both knowledge of the order and breach of its terms was not a fatal defect. The mandate was lawful as to unnamed persons within the group enjoined and engaging in the acts aimed at.
The usual defense of constitutional protection is also interposed, the claim being that the defendants were merely engaging in symbolic free speech at the time of the occupation and were thus protected by the First Amendment. The First Amendment protection of free speech does not extend to the type of action with which we are concerned here which involves actual damage and injury to the plaintiff and a serious breach of the peace and the public order. This court has found no authority that extends First Amendment protection so far.
Holding that the temporary restraining order constituted a valid exercise of this court’s powers and was within its jurisdiction, we next turn to the argument that the mode of service provided for was unauthorized and did not give reasonable notice.
CPLR 308 (subd. 5) empowers a court to prescribe the mode of service of process where normal means are unavailing. This provision was considered and broadly construed by the Court of Appeals in Dobkin v. Chapman and two related cases (21 N Y 2d 490). Recognizing that circumstances may often exist— usually of the defendant’s own making — where it is impossible to give the defendant that clear and positive notice of process which is most desirable, the court nevertheless held that less certain methods would stand the constitutional test of due process, In this court’s opinion the mode of service prescribed in the order of April 28, 1972, meets this tést. Furthermore, the evidence adequately shows that service in accordance with the terms of the order was made. The modes of service prescribed *969 were in the alternative. Personal service was attempted in several instances with some scant success, being thwarted by the defendants themselves in two instances. The order and supporting papers were posted in Carpenter Hall. The contents of the order were read by the use of a “ bullhorn ” to a group of students in the library who, according to one witness, quieted down for the purpose of hearing it. And copies were posted elsewhere. Every defendant admitted that he had some knowledge of the order and only failed to understand it because of failure to ask. Again, Chandler Morse heard it and as self-styled adult adviser to the occupying students he was in a position to make its tenor known to all.
Obedience to an injunctive order is undeviatingly insisted on, as to spirit and obvious intendment as well as in literal compliance ; and it is considered the duty of the party enjoined not only to comply personally but to prevent a violation by anyone acting in his behalf or subject to his order. It is not open to the party enjoined to quibble about the propriety of the injunction unless the court has no jurisdiction to issue it. He must obey fairly and honestly unless by due and proper application to the court or through appeal he obtains a modification or vacation of the mandate. With this general statement of the law we turn to the defenses and excuses offered by the various defendants.
The argument is made that there was no interruption of Cornell functions and that the Carpenter Hall library provided adequate service during the occupation. This was the view of a number of the defendant’s witnesses who were obviously seeking to express their sympathy with the political objectives of the defendants instead of facing reality. The evidence is clear that the entrance doors were closed with rope; that students, secretaries, faculty and others entered only by sufferance of the occupying group; that the library was occupied by from one hundred to five hundred students at all times; that 1 ‘ safe passage ’ ’ had to be sought and granted for administrative personnel seeking to talk to. the occupiers; that ‘ ‘ free access ’ ’ was mainly through the windows; that a library service on a limited basis was established only after debate and voting and was at all times subject to the control of the students as to hours of operation. While there may have been no violence or threats, the presence of this number of students under the circumstances here may be said to constitute violence ipso facto.
The defense further urges that by continuing to negotiate or discuss issues with the occupying students, the plaintiff has waived any right to pursue its remedies by way of contempt pro *970 ceedings. But it is clear that at all times the university administration made it clear that the students must leave Carpenter Hall. This was admittedly told them time and again and was a written part of one of the proposals submitted to the students. Of course the university hoped to talk the students out of their illegal occupation and thus avoid violence and the danger of personal harm. They are to be commended for keeping the avenues of communication open to this end. They should not now be deprived of their rights because they acted in good faith in not resorting to a “ police bust ” or other violence. On the other hand, negotiations had a different meaning to the students. It had been made clear to the administration, as one defendant stated, that the students were serious in their demands that the university reach an agreement satisfactory to them on the points at issue. This is not negotiation; this is ultimatum.
The argument that there is no basis for contempt since the defendants are now in compliance with the temporary restraining order is specious. They never complied with that order. It expired by the granting of a temporary injunction by this court at the very minute they left the building.
Then there is the excuse that there was no intent to be in contempt of court. The answer to this is the simple one that a person intends the natural and probable consequences of his act. It is no defense that the defendants did not intend to violate the order of the court if they did, in fact, intend to do the acts forbidden. This they did intend and this they did do.
The final defense or excuse concerns the matter of the negotiating committee. This group, which included several of the defendants here, was a group constituted by those very persons who were in unlawful occupancy of Carpenter Hall and, after 6:00 p.m. on April 28, 1972, in disobedience of the court order. They protest that they were used by the university to relay messages. The answer is that no such relay would have been necessary had they and others obeyed the order. And it was this group who more than any of the others recognized that the university — and presumably this court — was serious about insisting on compliance with the order. Would not it have been a proper part of their messenger duties to have carried this information to the occupying group and urged compliance? The university was not using them. The university was trying— through them and all other available channels — to get the students out of the Carpenter Hall library. The negotiating committee, on the other hand, was intent solely on enforcing the demands of those continuing to ignore the court order.
*971 Finally, it is urged that the plaintiff has an adequate remedy through use of the university judicial system and that the drastic remedy of injunction and contempt is unsuitable for this situation.
The plaintiff has no other remedy for violation of this court’s order and the university disciplinary actions concern themselves with alleged offenses other than such violation and with acts occurring prior to issuance of the order.
It may be true that relief by way of injunction and contempt is clumsy, slow and involved. But isn’t this, in essence, the very basis of our judicial system with its emphasis on protection of the rights of the individual throughout ? Chandler Morse, in his testimony, expressed the thought that this slow and deliberate method of proceeding in a free country should be cast aside for the present in favor of more precipitate methods which, like the seizure of Carpenter Hall, tramples on the rights of all those who do not immediately accede to the demands of the self-appointed saviors of our country and our civilization.
It is this court’s view that nothing could present a greater threat to the liberties of every American and that now more than ever is a time to act deliberately and avoid the type of action involved here with its potential for violence and injury.
I accept the assurance of all defendants that no personal contempt was intended towards me, but their acts were in defiance of an order of the court which I represent and were contempt of such court and of the system of law which I am sworn to maintain. It is no answer to say that this particular procedure is unsuitable for this situation. It is available to the plaintiff and seems, under the circumstances, to present a solution short of instigating a repetition of the Kent State episode. Our judicial methods may be slow and cumbersome. And attorneys and their clients will continue to take advantage of that very condition of our judicial system. But the remedy is available and the plaintiff has the right to invoke it.
Each of the individual defendants admitted some knowledge of the order and an indifference towards learning more about it. With one exception, each defendant was carefully and positively identified as being in Carpenter Hall at the times specified in the affidavits and at other times as well. The denials of Joanna L. Brown, Laurin Herr, George Hildebrand and James Livingston are not convincing. Much of their testimony is based on lack of recall rather than absolute denial. Nor is the excuse of Mary Leonard .that she was present merely to clean the bathroom of much weight. I am satisfied that John Dennis was in the library merely to learn the terms of the order and that he *972 left and stayed away thereafter and as to him I find no basis' for a holding that he is in contempt of court, I find that the other defendants ■ — Joanna Brown, Donald Eng, Laurin Herr, George Hildebrand, Bridgford Hunt, William Karl, Mary Leonard, David Linden, James Livingston, Alan MacRobert, Ned. Miltenberg, Mary Mintzer, Paul Mirsky, Chandler Morse, Douglas Rae, Joan Schmukler and Milton Taam — are in contempt of court. As to them. I deny the motion of the defendant for a dismissal and grant the motion of the plaintiff.
This is a civil proceeding. Its purpose is to in some measure compensate Cornell University for damage sustained, as a result of the defendants’ wrongful acts. Each defendant is in the same position as a joint tort-feasor in a negligence action and is equally responsible for all damage suffered by the university from 6 -.00 p.m, Friday, April 28 to Monday, May 1,1972. On the basis of the evidence presented at the hearing concerning extra costs and legal fees incurred, as a result of the defendants’ actions I find that a fair assessment of. such damages is in the sum of $20,000.
The court finds no reason to differentiate between these defendants in an attempt to assess degrees of guilt. Each was equally in contempt of court; each equally violated the court’s order and ignored its mandate. I impose on each defendant held in contempt a fine of $250 to be collected by the Sheriff of Tompkins County and paid over to Cornell University in partial satisfaction of the damages sustained,, and I direct that each, defendant be forthwith committed to the Tompkins County jail and. held there until such fine is paid, .but in no event for more than 30 days.